IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS


FATAI A. AYOADE,

       Plaintiff,

v.                                    Case No. 21-2084-JWB

JOHNSON COUNTY COMMUNITY COLLEGE, and
JOHNSON COUNTY COMMUNITY COLLEGE
BOARD OF TRUSTEES,

       Defendants.


**MEMORANDUM AND ORDER**

This matter is before the court on Defendants' motion for summary judgment.  (Doc. 84.)
The motion is fully briefed and is ripe for decision.  (Docs. 85, 88, 92.)  For the reasons stated
herein, Defendants' motion for summary judgment is GRANTED.

**I.  Facts and Procedural Background**

The court finds the following facts to be uncontroverted for purposes of the motion for
summary judgment.  The following statement excludes a number of assertions by the parties that
do not conform with Rule 56 or D. Kan. 56.1.  These include a multitude of factual assertions that
do not refer with particularity to the portions of the record relied upon.[1]

Plaintiff is a Nigerian-born black male, who is a citizen of the United States.  He graduated
from Premier College in Lagos, Nigeria, in 1979.  Plaintiff graduated from Park University in

---

[1] The court is not obliged on summary judgment to sift through a string of record citations at the end of a lengthy
recitation of facts in an attempt to ascertain which citations pertain to or support which factual assertions.  The
summary judgment rules require the party asserting a fact to support that particular fact with a specific record citation.
*See* D. Kan. R. 56.1(b)(1) ("Each fact in dispute must be numbered by paragraph [and] refer with particularity to those
portions of the record upon which the opposing party relies….")

Parkville, Missouri, in 1988 with a bachelor's degree in Computer Based Information Systems.  In 2005, Plaintiff obtained a master's degree in education from the University of Kansas.  (Doc. 88 at 18.)

Plaintiff began his employment with Johnson County Community College (JCCC) in August 1990 as the part-time men's assistant soccer coach.  From August 2000 to July 2016, he served as the part-time men's head soccer coach.  From July 2016 until his discharge on February 10, 2020, he was JCCC's full-time men's head soccer coach.

Plaintiff was one of three black head coaches who coached at JCCC within that period. Sonny Maynard served as a head coach for a total of 15 seasons (men's baseball and women's basketball) and Lafayette Norwood served as a head coach for 32 seasons (men's basketball and golf).  Plaintiff was the only coach of color at JCCC, however, from 2014 until his termination.

Plaintiff was highly successful as a head coach, winning four Region VI titles, five Kansas Jayhawk Conference titles, and reaching the National Junior College Athletic Association (NJCAA) National Tournament twice.  He had the most soccer wins in school history, was selected as conference coach of the year five times, and achieved other awards as well.  (Doc. 88 at 18-19.)

In August 2016, Carl Heinrich ("Heinrich"), the Dean of Athletics and Plaintiff's direct supervisor at the time, instructed Plaintiff that a men's soccer player was ineligible to play under NJCAA rules, and that the player should neither travel for, nor participate in, an August 25, 2016, competition.   Despite that instruction, Plaintiff allowed the player to travel and participate in the competition after the player told Plaintiff that he "took care of business," which Plaintiff took to mean the player had resolved the issue that made him ineligible.  (Doc. 85-2 at 5.) The player had not done so and in fact was ineligible. Had the team won, it would have had to forfeit that game;

fortunately, in this instance, JCCC lost the match.  As a result of the ineligible player participating, JCCC self-reported a rules violation to the NJCAA.  (Doc. 93 at 3.)

Pursuant to JCCC policy 415.08, participating in an activity which could reflect poorly on JCCC, violating JCCC policy or rules, or failing to comply with the reasonable directives of a supervisor are all grounds for suspension, demotion, or termination.  On August 31, 2016, as a result of Plaintiff playing the ineligible player, Plaintiff was suspended for one day, with pay, and was placed on a performance improvement plan ("PIP").  The notice of the suspension included an admonition that in the future Plaintiff would be "expected to comply with all directives of your supervisor, in addition to following all NJCAA bylaws."  (Doc. 85-3 at 7; Doc. 85-2 at 27.)

In June 2017, Plaintiff was rated by Heinrich as "Exceeds Expectations."  (Doc. 88-42 at 5.)  In December 2017, Athletic Director (AD) Randy Stange gave Plaintiff an overall rating of "Meets Expectations."  (*Id.* at 11.)  Stange also rated Plaintiff as "Meets Expectations" in 2019.  (*Id.* at 17.)

Sometime in 2019, Brad Tully, a men's soccer player from Jamaica, was distraught and reported to Heidi McCormick in the AD's office that Plaintiff was going to make him pay $100 for soccer cleats and Tully did not have the funds.  (Doc. 85-8 at 4.)  When Stange was informed of this, he asked Plaintiff about it.  There is some evidence in the record suggesting that although the team provided players with a pair of running shoes, they were expected to furnish their own cleats.  In the course of this discussion, Plaintiff informed Stange that he was doing a t-shirt "fundraiser" in which he was requesting and collecting $30 from his players in exchange for three t-shirts.  (Doc. 85-2 at 9.)  JCCC policy provided that collected funds must be deposited into the JCCC Foundation or Bursar account the same day or within one business day of receipt.  (Doc.

85-9 at 2.)  Stange testified that he informed Plaintiff "that if anybody bought a t-shirt that he immediately needed to put that money in the foundation…."  (Doc. 85-8 at 4.)

On September 24, 2019, JCCC received an "Ethics Point" report – a confidential complaint reporting service – that included allegations against Plaintiff.  It alleged that multiple student athletes had reported they were not given enough food to eat on trips and were supposed to receive a food per diem of $31 on trips but were instead given $20 and an apple.  It cited a report that the men's soccer team purchased tennis shoes for the team and then asked players to pay for them with cash, and that players who did not pay did not get shoes.  It also questioned where the money that players paid was deposited and asserted that when questions were raised, players without shoes "miraculously" received them without paying.  It further alleged that soccer coaches "constantly degrade players" and misled them with false information about various things.  It alleged that an international player with "some family connection with the Ayoade family in another country" arrived to play soccer at JCCC with a known injury.  (Doc. 93 at 5-6.)

The next day, September 25, 2019, JCCC received a second Ethics Point report that alleged: "For the past two years, players from the men's soccer team have been made to pay for athletic shoes and shirts that were already paid for from the athletic budget. They were threatened by [assistant] Coach Jimmy Perez not to tell anyone [this past August.] Players have also been made to sign off on meal sheets for meals not received and for amounts more than what was received."  (*Id.* at 6.)

Justin McDaid, JCCC's Director of Audit and Advisory Services (AAS), received the Ethics Point reports.  He met with Collen Chandler, Director of HR, and Julie Vivas, an Employee Relations Manager, and discussed how to proceed.  McDaid reviewed materials and determined that additional investigation was warranted.  He and Vivas conducted the investigation together

and looked at the following allegations: (1) that over several soccer seasons, Plaintiff allegedly failed to disburse per diem meal funds while forcing students to sign "meal sheets" indicating receipt of cash and students were not receiving enough food during team travel days; (2) that men's soccer team members were asked to pay cash to Plaintiff in return for athletic shoes and shirts that were purchased using JCCC funds; (3) that men's soccer coaches, and particularly Plaintiff, were verbally abusive and degrading to student athletes, threatening or misleading them about transfer prospects, academic eligibility, financial matters, and immigration status; and (4) that Plaintiff had an unspecified conflict of interest regarding an international student athlete on the men's soccer team that had a family connection to Plaintiff.  (*Id.* at 7-8.)

During the investigation, Vivas and McDaid interviewed the following individuals affiliated with JCCC: Plaintiff (twice); Jimmy Perez (men's soccer assistant coach); Ibrahim Kante (men's soccer assistant coach); Randy Stange (Athletic Director); Brad Tully (men's soccer player); Claudio Vinicius Monterior de Silva (men's soccer player/team captain); Jim Schwab (women's head soccer coach); Jonathan Lovercamp (Athletic Trainer); Beth West (Athletic Trainer); Betsy Petre (Administrative Assistant PE and Athletics); Heidi McCormick (Office Assistant PE and Athletics); Pam Vassar (Assistant Dean of Student Life); and Susan Rider (Director of Accounting Services and Grants).  (Doc. 85 at 7.)

Vivas and McDaid reviewed documents associated with the allegations, including men's soccer budget records, Plaintiff's response to allegations, marked and unmarked envelopes with cash found in Plaintiff's office, JCCC policies, and the Kansas Jawhawk Community College Conference (KJCAA) constitution and bylaws.  (Doc. 85 at 7.)

On or about October 4, 2019, Plaintiff was provided notice of the complaints, told an investigation was being conducted, and was interviewed.  He was told not to contact potential

witnesses related to the allegations and not to retaliate against anyone.  (Doc. 88-4 at 5; Doc. 85-2 at 7; Doc. 88-17 at 2.)  Two players later reported that Plaintiff told the team they should keep concerns "within the team" rather than talk to anyone outside and suggested "something bad" might happen if players spoke to outsiders.  (Doc. 85-5 at 8.)

On October 4, 2019, assistant men's coach Jimmy Perez was interviewed and stated that no player was asked to pay for equipment that had already been paid for with school funds.

Heidi McCormick was interviewed on October 17, 2019.  She told investigators that Brad Tully had told her that Plaintiff had used the word "snitches" in talking to the team and that all of the team got shoes except Tully.  Twelve days later, McCormick sent McDaid an email raising additional allegations against Plaintiff.  (Doc. 88-8 at 4.)  Tully had been interviewed on October 10, 2019.  Apart from alleging that Plaintiff had used the word "snitch," Tully did not corroborate any of the allegations first brought against Plaintiff.  Trainer Beth West was also interviewed on October 10, 2019.  She told investigators she had heard Tully say players had to pay $70 for "shoes and jackets."  That allegation was false and was not corroborated by Tully.  (Doc. 93 at 41.)

Plaintiff was placed on paid administrative leave on November 8, 2019, and was prohibited from entering JCCC until the investigation into his conduct was concluded.  (Doc. 77 at 3.)

In a letter to Plaintiff from JCCC dated November 8, 2019, Plaintiff was notified of allegations of retaliation and interference arising from his talk to the soccer team on October 7.  Plaintiff was given seven days to submit a written response.  (Doc. 85-2 at 29.)  Plaintiff submitted an email response dated November 11, 2019.  (Doc. 85-2 at 31-32.)  In the response, Plaintiff denied the allegations in the Ethics Point reports and denied having told anyone to hide or not disclose information.  He explained that he regularly talked to his team after daily practice and that

> During one of these talks, I said the following: "I am not here to steal any of your meal money. I make my own money," before I jokingly added that "Even though I

may not be rich." I explained that the Snacks, Fruits, Water, Muffins, [and] any other items such as tips I gave to a pizza delivery person or waiters at restaurants, are paid for from the team's meal money. I told them that there is no column on the meal sheet where they saw money allocated to pay for those items on any of the team meals. I notified them that they can always ask if they have any questions about how the funds are spent, but I never asked/told anyone not to talk or hide any information from both of you. I did not mention anything about the investigation.

(Doc. 85-2 at 31.)

Plaintiff's November 11 email also asserted that during the October 4 interview with McDaid and Vivas, Plaintiff had explained the t-shirt fundraiser, and further asserted that after Plaintiff had acknowledged not giving any receipts to players who had paid $30, McDaid had told him "I could not use the T-Shirts for fund raiser [sic]." (Doc. 88-15 at 2.)  Plaintiff's email thus asserted that "I have the money in the office and I was going to return the money to the players that paid on November 11, 2019 when they turned in the team's equipment that was issued to every one of them." (*Id.*)  In the email, Plaintiff denied having ever sold shoes to players or having misled players about the costs of schooling, insurance, meals, or other items.  He asserted these allegations were "stuff they made up about me" and that the information he supposedly misled players about was available online. (*Id.*)

When Plaintiff was first interviewed on October 4, he indicated he had deposited "fundraiser" amounts into JCCC's Foundation account. (Doc. 85-5 at 9, 26-27.)  In his deposition, Plaintiff was asked whether Stange had told him to immediately deposit t-shirt funds:

Q. Is it correct that you were directed by Randy Stange to immediately deposit the t-shirt funds into the Foundation?

A. Remember when I told you that when he met with me, I have not even collect anything.

Q. But then you eventually collected funds, right?

A. Yeah, and I collected, and it was not once. This person bring. This person bring. That person bring. It's not at one time. So I was waiting to collect, then take.

Q. And it's correct then that you did collect money from the players and that you did not deposit it into the Foundation; is that correct?

A. It is incorrect in the sense that I collect money, but did not collect all of it together to take to them. But what I have is what I have, but not all of it. So I was waiting to collect all the money and take it to them. So if you say I did not take, I would say I did not take. But I was waiting to collect everything to take.

Q. You were waiting for all of the players to finish paying before you took all the money to the foundation?

A. Yes, sir.

Q. And then you said there were some players that never did pay; is that right?

A. Yes, sir. Yes, sir.

(Doc. 85-2 at 16.[2])

When Plaintiff was asked at his deposition to explain the t-shirt fundraising, he testified as

follows:

Q. Okay. So tell me in more detail how that would work. You would request a contribution of $20 from the players in order to get t-shirts?

A. I would tell them we will get them three t-shirts and, you know, donate 20 or $30 if you can. And the ones that cannot, they didn't pay. Not everybody paid.

Q. They still get the t-shirts?

A. Yes, sir.

Q. Would you use those – what would you use those for? Practices or what?

A. Practice.

* * *

---

[2] In view of the above testimony in which Plaintiff failed to controvert the assertion that Stange told him to "immediately" deposit t-shirt funds into the Foundation account, the court finds no genuine issue of fact challenging Stange's testimony on that point.  This is true notwithstanding Plaintiff's assertion in a letter (when he appealed his termination) that Stange "simply instructed me to make sure that the money was put into the foundation account once it was collected."  (Doc. 85-2 at 37.)  Plaintiff cites no sworn testimony to that effect, and at any rate, as discussed herein, there is no evidence that Defendants' asserted belief that Plaintiff failed to follow Stange's directive to deposit the money was a pretext for discrimination.

Q.  Okay. And the players were asked to donate 20 or $30 for the shirts, some people didn't pay, they still got the shirts, correct?

A. Correct.

Q. What happened to the money that was donated for the shirts?

A. We will pay the difference, because some of the leftover money from our budget for uniforms, we pay, and the differences, we pay differences from whatever we collected from the players.

Q. I'm not following that.

A. Yes. We have a budget –

Q. Yes.

A. – for uniform. Let's say they give us $8,000 –

Q. Sure.

A. – for uniforms. Okay, whatever is left in there, we can use it at part of the t-shirts. But majority of the time, there's not enough money left.  And unless there is a little bit of money left, whatever we collect, we pay the difference to make sure for the t-shirts.

Q. You pay the company that provided the t-shirts?

A. Correct.

Q. So when the students, when the athletes would donate the 20 or $30, that money would then go to the t-shirt company?

A. Correct.

Q. – to pay for the shirt?

A. Yes, sir.

Q. Okay. Did that ever go through the Bursar's office? Or did you all just pay the money directly to the t-shirt company?

A. We pay – I think I tell my assistant to pay them.

Q. To pay the t-shirt company?

A. Yes, to pay what is left, whatever left to be paid.

Q. So that's what would happen to the donations that the students made for the t-shirts, it would then just go to the t-shirt company?

A. Yes. Yes. Pay them.

Q. Do you recall ever asking students to donate or otherwise pay for any supplies or equipment other than the t-shirts?

A. No, sir.

Q. Did you ever collect money from the students with the intent to return the money to the students whenever they returned certain equipment?

A. That was last year.

Q. Okay.

A. This last year.

Q. The AD told me to make sure I sent the money to the Foundation, and I said okay. But, at this time, I haven't collect anything.

Q. What were you intending to collect for? What was the reason?

A. The t-shirt. The t-shirt.

Q. Okay, So the AD, that's Randy, right, Randy Stange?

A. Randy. Randy Stange.

Q. Told you to make sure that any money you collected for the t-shirts got sent to the Foundation?

A. Correct. This was preseason. Season have not even started.

Q. Yeah, but at the time he told you that, you hadn't collected any money yet?

A. No money.

Q. Okay. Separate from the t-shirt, was there any time you collected money from students and intended to return the money to the students after they returned equipment?

A. No. No. No. It was only this one.

Q. It was only the t-shirts?

A. It was only the t-shirt and it was only this.  That's it.

(Doc. 88-14 at 6-7.)

While Plaintiff was on leave during the investigation, Stange went to Plaintiff's office and retrieved over $800 from a file cabinet. One envelope containing $310 was labeled "2018 T-shirt." Another envelope (unlabeled) contained $185. A stack of $345 was underneath a JCCC meal sheet and various receipts. (Doc. 85-5 at 27.)

Some prior incidents were referenced or alluded to when a final investigative report was prepared, including the following. At an August 2, 2018, coaches meeting that Plaintiff attended, coaches were encouraged to use their travel cards to pay for student meals. If that was not possible "and it would be better to have to have the cash to pass out to the athletes," a Meal Allowance form needed to be submitted, which would allow "a cash advance on behalf of the coach." (Doc. 85-2 at 26.) Meal Allowance forms signed by athletes were then to be submitted. (Doc. 85-2 at 26.) Plaintiff at times directly bought food for his players with cash issued by the school and sometimes provided players with the per diem cash payments.

In 2016, JCCC coaches were instructed by Heinrich to no longer purchase food for bus drivers of their teams. On at least two occasions thereafter, Plaintiff provided bus drivers with food paid for by school funds. (Doc. 85 at 10; Doc. 85-12 at 2-6.) Plaintiff claimed he followed "the common practice in the athletic department" of permitting bus drivers "as a matter of common courtesy" to eat "extra food left over from communal meals" such as food bought in bulk or leftover pizza. (*See* Doc. 85-2 at 37.) On August 28, 2019, Plaintiff emailed Betsy Petre back after she noted that only athletes could be included on meal expense sheets, and indicated he thought bus drivers should be included on meals as "an appreciation for keeping the team safe." (Doc. 85-13 at 2.) She replied that the college could not pay for drivers because they were not college personnel. (*Id.*)

11

Pursuant to NJCAA rules, coaches cannot purchase meals for parents of recruits.  Plaintiff informed JCCC that he unintentionally paid for a recruit's mom, dad, and sister's meals while at a lunch buffet.  As a result, JCCC self-reported this violation to the NJCAA.  (Doc. 85 at 11; Doc. 85-16.)  In one of his interviews with McDaid, Plaintiff said he knew he was not supposed to pay for a recruit's family but stated that he considered it "a gray area."  (Doc. 85-2 at 16.)  Assistant coach Jimmy Perez testified that he told Plaintiff many times that recruits' parents could not eat school provided meals, but Plaintiff said, "he'd be fine," and Perez responded, "Okay, you're the boss."  (Doc. 85-15 at 3.)

A final investigative report on the allegations against Plaintiff was submitted by McDaid and Vivas on January 15, 2020.  (Doc. 85-5 at 25.) The summary of findings in the report included the following.  With regard to travel policies and per diem payments, the report found that Plaintiff failed to follow school procedures because coaches had been instructed to either provide players with the actual per diem or to use a procurement card.  It found there were instances where Plaintiff purchased food and instances where he gave a portion of the per diem to players. It said the investigation was "unable to substantiate whether the amount of food purchased was equivalent to the cash per diem … as [Plaintiff] did not provide receipts when turning in signed meal sheets." (*Id.* at 26.) It cited evidence that Plaintiff submitted a meal sheet with a signature for a trainer who stated that he had not signed the sheet and had not received a per diem payment for that trip.  With regard to t-shirt fundraising, the report said Plaintiff has provided "many different versions of what he has or was planning on doing with the money," including asserting in his first interview that he had deposited money with the Foundation, stating in a written response that he planned to return the money to players on the day he was placed on leave, stating in his second interview that he intended to deposit the money once all the players had contributed, and also stating in his second

interview that he would sometimes use that money for team bonding events. The report cited the circumstances in which the cash was located and concluded Plaintiff did not follow school policy in the handling of collected money and that investigators were unable to substantiate how the money was used or how much was collected due to Plaintiff's failure to keep records. (*Id*. at 27.) With regard to allegations of being abusive, threatening, or misleading players, the report said the evidence did not demonstrate that Plaintiff was verbally abusive or degrading, and cited no evidence of misleading players, stating only that Plaintiff had recruited more players than were permitted on the team, leading some to be dissatisfied when they were cut from the final team. The report found no evidence to support the allegation that Plaintiff had a conflict of interest or a family connection to an international student on the team. With respect to the allegations of Plaintiff telling players not to cooperate with investigators, the report noted that three days after Plaintiff had been instructed not to contact witnesses about the allegations, Plaintiff spoke with the team, and two players "confirmed that [Plaintiff's] statements included an instruction that they should keep the concerns within the team instead of talking to anyone outside" and indicated "something bad might happen" if players spoke to outsiders about team issues. (*Id.* at 28.) Finally, the report noted Plaintiff had purchased meals for a recruit's family, leading to an NJCAA violation, and noted Plaintiff's belief that this is a "gray area." (*Id.*)

Dr. Randy Weber, the Vice President of Student Success and Strategy, testified that he made the decision to terminate Plaintiff's employment along with Vice President of HR Becky Centlivre. Weber reviewed the investigation report and said it showed Plaintiff "admitted to items that were continued challenges he faced that were the [reason] for the [2016] performance improvement plan." (Doc. 85-7 at 3.) Weber cited as examples the report's assertions that Plaintiff had fed bus drivers after being directed not to because Plaintiff believed "you take care of the

people who take care of you," that he fed a recruit's family and indicated he considered the rule against doing so a "gray area," and (according to Weber) "there seemed to be inconsistent responses to what was going to be done with the fundraising money." (*Id.* at 6.) Weber conceded that such incidents alone would not justify termination, but testified that in his view "we had an individual who struggles to follow administrative procedures and policies," who was previously "put on a performance improvement plan, specifically and inclusive of following [his] supervisor and NJCAA bylaws," and who "continues to demonstrate struggle and violates college policy and doesn't follow the directive." (Doc. 88-26 at 9-10.) Weber asked Centlivre "what do we normally do when we have a person who has a performance improvement plan and then has continued offenses consistent with what was the purpose for creating the performance improvement plan?" (Doc. 85-7 at 3.) Centlivre said such persons are typically terminated. Weber said he "would support that decision" and terminated Plaintiff's employment. (*Id.*)

Pursuant to school procedures, Plaintiff appealed his termination, which was then reviewed by Mike Souder, an employee of the JCCC HR Department. Sounder reviewed the documentation, interviewed Plaintiff and two other individuals, and found the termination decision to be substantiated. Centlivre concurred in Souder's determination and upheld the termination, making the decision final. (Doc. 85-18 at 2.)

Following the termination, JCCC sought to fill the men's soccer coach opening. A hiring committee consisting of Stange, Jayne Wilcox, Beth West, and Pam Vassar reviewed applications and eliminated some persons based on prior coaching and recruiting criteria, before using "individual assessment matrices" to compare the remaining applicants. (Doc. 85-8 at 10-11.) This process resulted in four final applicants being interviewed and scored on a matrix that assessed various attributes. Jeff Cole had the highest score on the matrix and was selected as coach. Cole

was given a rating of 3 (signifying that the candidate meets expectations) in each category except one in which he was the only candidate to receive a rating of 4 (the highest rating signifying that the candidate exceeds expectations) for his interpersonal skills. The latter rating was the only difference between Cole's score and that of candidate Carlos Olivas, who received a rating of 3 in each category. (Doc. 85-19.)  Cole was the only one of the final candidates who was white; the other three were racial or ethnic minorities. (Doc. 85-8 at 11.)

Plaintiff contends that when he was first hired he was paid less than other assistant coaches. When asked how he knew, he said, "When they change athletic director and she saw my pay, I went from 1,000 to 11,000." (Doc. 85-2 at 18.)  Plaintiff believes it was "obvious" that this was due to his race because he was the only black coach in the department.

Plaintiff believes he was scrutinized more harshly than his white counterparts and that his team was treated less favorably than other teams.  He cites the following in support of that assertion.  In 2019, Plaintiff's team was deprived of the use of some seats on the travel bus in favor of the women's program, which was coached by a white male. The men's and women's teams sometimes shared a travel bus and a certain number of seats were allocated to each team.  A dispute arose after Plaintiff requested more seats than were allotted for the men's team, but the coaches resolved the issue. (Doc. 93-5 at 6; Doc. 88-14 at 8.)  Plaintiff also testified that the men's and women's soccer coaches were told not to practice on the game field, but the women's coach would practice there and nothing would happen, although "I know if I go and practice on it … there's going to be a problem," so "I try not to do it." (Doc. 88-14 at 12.)  Plaintiff said when he complained to (then) AD Carl Heinrich about it, Heinrich told him "[i]t's you guys' field … you can do anything you want," and "if you guys want to tear it up, tear it up." (*Id.* at 13.) When Plaintiff said "well, why is the women['s] team practicing on it," Heinrich said, "okay, I will see

what I can do," but nothing ever happened.  (*Id.*)  Plaintiff testified that Heinrich yelled at Plaintiff and pointed in his face on one occasion for letting an alumni use a JCCC secure, private facility.  (Doc. 85 at 13.)  Plaintiff also testified there were times when his team was not allowed to use the weight room because other teams were using it even though the soccer team had been scheduled to use it.  (Doc. 88-14 at 14.)  Similarly, there were times when the men's soccer team was training on the soccer field and a high school team that had rented the field would displace them.  Plaintiff indicated the person responsible for scheduling these matters, Jim Dice, and others "didn't care about men's soccer."  (*Id.*)

Plaintiff was always paid less than the women's soccer head coach, Jim Schwab.  Plaintiff has a bachelor's and a master's degree; Schwab does not have a college degree.  Schwab had more tenure than Plaintiff; Schwab had been the men's soccer coach for ten years before he took the job as women's head coach in 2000.  (Doc. 93-1 at 7.)

In 2015, JCCC self-reported a violation to the NCJAA after an ineligible student participated in a cross-country event.  Although the student appeared to be enrolled in the requisite minimum of 12 credit hours, one of the courses was a "mini course" that did not actually start until after the season was over, making the student ineligible.  The coach was not disciplined. (Doc. 93-2 at 6; Doc. 88-39 at 3.)

In 2016, the JCCC track and field coach, who was white, lied to campus police by saying he did not know anything about vandalism to a poster near his office. When video was produced showing the coach had removed part of the poster after it was vandalized, he admitted having done so but maintained he did not know who initially damaged the poster. When Heinrich indicated he would continue to investigate the matter, the coach returned with a student athlete who admitted having committed the original vandalism.  The coach was suspended without pay for five days,

was prohibited from being on campus or having contact with the school for that period, and was placed on a performance improvement plan.  (Doc. 88-45 at 2.)

Jim Schwab, the women's soccer head coach, allowed a recruit's parents to eat with the team while in Texas.  No investigatory or disciplinary actions were taken against him. (Doc. 93 at 49.)

Plaintiff was 59 years old when he was terminated.  He was replaced by a white individual who was much younger and had less experience.

Plaintiff claims he was discriminated against in violation of Title VII because of his race, color, and national origin.  He alleges that his discipline and termination were motivated by these factors, that he was subjected to a hostile work environment based on these factors, and that he was retaliated against because he complained of race discrimination.  Plaintiff also contends he was terminated because of his age in violation of the ADEA.[3] (Doc. 77 at 20-23.)

Defendants seek summary judgment on all claims.  They argue Plaintiff has failed to cite sufficient evidence to show a hostile work environment, that he has failed to show a prima facie case of unlawful discrimination, and that he fails to show a genuine issue of fact as to whether Defendants' stated explanation for its actions was pretextual.  (Doc. 85.)

## II.  Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that

---

[3] Plaintiff also asserted a claim of racial discrimination under 42 U.S.C. § 1981 arising from a hostile work environment and his termination.  In response to Defendants' summary judgment motion, however, Plaintiff "concedes this point, as a matter of law, and withdraws his 1981 claim and any punitive damages claims."  (Doc. 88 at 37.)

there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphases in original). "A fact is material if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is genuine if a rational jury could find in favor of the nonmoving party on the evidence presented." *Doe v. Univ. of Denver*, 952 F.3d 1182, 1189 (10th Cir. 2020) (quoting *Jones v. Norton*, 809 F.3d 564, 573 (10th Cir. 2015)). Conclusory allegations are not sufficient to create a dispute as to an issue of material fact. *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). The court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

## III. Analysis

### A. Hostile Work Environment.

Title VII makes it unlawful for an employer to discharge or discriminate against an individual with respect to the terms or conditions of employment because of that individual's race, color, or national origin (among other reasons).  42 U.S.C. § 2000e-2(a)(1).  The ADEA similarly prohibits such discrimination against a person "because of such individual's age."  29 U.S.C. § 623(a)(1).  A plaintiff can prevail under these provisions by proving he was subjected to a hostile work environment on account of a protected characteristic.  To support such a claim a plaintiff must show: 1) he was discriminated against because of a protected status, such as race, color, national origin, and/or age; and 2) the discrimination "was sufficiently severe or pervasive such that it altered the terms or conditions of his employment."  *Throupe v. Univ. of Denver*, 988 F.3d 1243, 1251 (10th Cir. 2021).

In determining severity and pervasiveness, the court looks to the totality of the circumstances and considers "such factors as the frequency of the discriminatory conduct; its

severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* as 1252 (quoting *Morris v. City of Colo. Springs*, 666 F.3d 654, 664 (10th Cir. 2012)). "It is not enough that the plaintiff perceived the conduct to be severe or pervasive. Rather, the plaintiff must 'show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult." *Id.* (citing *Sanderson v. Wyoming Highway Patrol*, 976 F.3d 1164, 1172 (10th Cir. 2020)).  In other words, "the run-of-the-mill boorish, juvenile, or annoying behavior that is not uncommon in American workplaces is not the stuff of a Title VII hostile work environment claim." *Id*. (citing *Morris*, 666 F.3d at 664.)  Moreover, "'a few isolated incidents' of discriminatory conduct does not make harassment pervasive." *Id.*

Plaintiff asserts that he "can show that throughout his employment, but more severely and relevant, in the last two years he constantly endured disparate treatment, abuse, and harsher scrutiny – evidenced by the bias/one sided and ludicrous investigation that resulted in his termination." (Doc. 88 at 37.)  Plaintiff's allegations that he was discriminated against with respect to the school's investigation and termination of his employment is the subject of Plaintiff's claim for discriminatory discharge (addressed herein).  But these allegations do not show that his workplace was "permeated with discriminatory intimidation, ridicule, and insult" or otherwise support a claim for a hostile work environment.  Aside from the allegations of discriminatory termination, Plaintiff cites no instances of frequent or severe harassment in the workplace.  Essentially, he cites some occasions over the years in which the men's soccer team was inconvenienced or deprived of the use of facilities such as the weight room, travel bus, or practice field.  The examples cited involved no frequent or severe instances of physically threatening or humiliating conduct being directed toward Plaintiff.  He cites one instance of Heinrich yelling and

pointing at him.  He offers no circumstantial evidence indicating the incidents he cites were related in any way to Plaintiff's age, race, or color.  The record does not show whether other sports teams at JCCC experienced similar difficulties in scheduling or using athletic facilities.  It would hardly be surprising that different athletic teams might have some conflicts concerning the use of facilities or that some sports teams might be given priority to facilities such as a weight room.  To the extent Plaintiff cites evidence that the person in charge of scheduling facilities did not like the men's soccer team and caused him scheduling difficulties, such evidence fails to show a pattern of severe or pervasive harassment or to show that any such animus was tied to a characteristic protected by Title VII or the ADEA.  Taken in total, the instances cited by Plaintiff fall far short of the type of harassment regarded as sufficiently severe to alter the terms or conditions of employment.  Plaintiff has failed to show a genuine issue of fact with respect to the second element of a hostile work environment claim; Defendants are accordingly entitled to summary judgment on that facet of Plaintiff's Title VII and ADEA claims.

### B.  Discrimination in discharge

Plaintiff's claims that his discharge was motivated by discrimination – including because of his race, color, national origin, and age – rely on circumstantial rather than direct evidence. "Where, as here, a Title VII plaintiff relies on indirect or circumstantial evidence to show discrimination, we examine the claim under the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Anderson v. Fort Hays State Univ*., No. 22-3141, 2023 WL 2945859, at *2 (10th Cir. Apr. 14, 2023) (citation omitted.)  *See also Garrett v. Hewlett-Packard Co*., 305 F.3d 1210, 1216 (10th Cir. 2002) (Title VII and ADEA circumstantial claims both employ *McDonnell Douglas* analysis.) "Under that framework, a plaintiff carries the initial burden of establishing a prima facie case of discrimination."  *Anderson,* 2023 WL 2945859, at *2

(citing *Jones v. Barnhart*, 349 F.3d 1260, 1266 (10th Cir. 2003)). "If the plaintiff establishes a prima facie case, at the second step, the burden then shifts to the employer to offer a legitimate nondiscriminatory reason for its employment decision." *Id.* at *3 (quoting *Ford v. Jackson Nat'l Life Ins. Co.*, 45 F.4th 1202, 1215 (10th Cir. 2022)). "If the employer makes this showing, at the final step, the burden shifts back to the plaintiff to demonstrate that the employer's explanations were pretextual—i.e., unworthy of belief." *Id.* (internal quotation marks omitted).

A prima facie case of discrimination is established if the plaintiff cites evidence that 1) he belongs to a protected class; 2) he suffered an adverse employment action; and 3) the circumstances give rise to an inference of discrimination. *Ibrahim v. Alliance for Sustainable Energy, LLC*, 994 F.3d 1193, 1196 (10th Cir. 2021). The burden of establishing a prima facie case is not onerous and "can be shown by 'a variety of circumstances,' ranging from 'actions or remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus' to 'the timing or sequence of events leading to the employment action.'" *See Laber v. Austin*, No. 18-1351-JWB, 2022 WL 17361437, at *7 (D. Kan. Dec. 1, 2022) (quoting *Laul v. Los Alamos Nat'l Labs.*, 714 F. App'x 832, 836 (10th Cir. 2017)).

Plaintiff has cited evidence that he had a long history of success as a coach at JCCC, that he was qualified for the position and received positive employment ratings, and that he was 59 years old and was the only black, African American coach at JCCC at the time he was terminated and replaced by a much younger white coach. Absent some explanation for the termination, such circumstances could give rise to a reasonable inference that Plaintiff's termination was based on his color, race, and age, but only by the thinnest of margins. Accordingly, for purposes of this order, the court will assume that Plaintiff has made a sufficient showing of a prima facie case of

discrimination with respect to his termination.[4] *Cf. Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1229 (10th Cir. 2000) ("When viewed against the backdrop of historical workplace discrimination, an employee who belongs to a racial minority and who eliminates the two most common, legitimate reasons for termination, i.e., lack of qualification or the elimination of the job, has at least raised an inference that the termination was based on a consideration of impermissible factors.") (quoting *Perry v. Woodward*, 199 F.3d 1126, 1140 (10th Cir. 1999)).

Defendants assert that Plaintiff's employment was terminated because an investigation found Plaintiff had failed to follow school policy, NJCAA rules, and his supervisor's directives, and because Plaintiff had previously been placed on a PIP for similar concerns.  (Doc. 85 at 24-25.)  This satisfies Defendants' burden "to articulate some legitimate, nondiscriminatory reason" for the employee's termination. *McDonnell Douglas*, 411 U.S. at 802.  The burden thus shifts back to Plaintiff "to demonstrate that the employer's explanations were pretextual – i.e., unworthy of belief."  *Anderson*, 2023 WL 2945859, *3 (quoting *Ford*, 45 F.4th at 1215).

The uncontroverted facts show that Defendants began an investigation after receiving two anonymous complaints submitted under JCCC's "Ethics Point" reporting system.  In the course of the investigation, Defendants interviewed thirteen people, including Plaintiff (twice), two assistant men's soccer coaches (Perez and Kante), two men's soccer players (Tully and Monterio de Silva), the women's soccer coach, the Athletic Director, two athletic trainers, and several administrative personnel. Based on information gathered, additional allegations were looked into, including an allegation that Plaintiff told the soccer team not to cooperate with investigators. As Plaintiff points out, almost all of the initial anonymous allegations against him were ultimately found to be false

---

[4] The only basis Plaintiff articulates for an inference of national origin discrimination in his termination is the fact that Plaintiff is originally from Nigeria.  (Doc. 88 at 32.)  That fact alone, however, is inadequate to reasonably imply that his termination was motivated by his national origin.

or unsupported. But several allegations were found to be substantiated. These included findings that Plaintiff failed to follow school procedures because coaches had been instructed to either provide players with the actual per diem payments or to use a procurement card. The final report also found Plaintiff did not follow school policy in the handling of collected money and that investigators were unable to substantiate how the money was used or how much was collected due to Plaintiff's failure to keep records. The report found that Plaintiff spoke with the team shortly after being told not to contact witnesses and that two players – one of whom was the team captain – "confirmed that [Plaintiff's] statements included an instruction that they should keep the concerns within the team instead of talking to anyone outside" and indicated "something bad might happen" if players spoke to outsiders about team issues. (Doc. 85-5 at 28.) The report pointed out Plaintiff's purchase of meals for a recruit's family, which led to an NJCAA violation, and noted that Plaintiff expressed his belief that this is a "gray area." (*Id.*)

All of these findings had some factual support sufficient for a reasonable person to conclude they were substantiated. No reasonable inference of pretext arises from the mere fact that the investigation reached these conclusions. Nor has Plaintiff shown that Dr. Weber's asserted reasons to terminate Plaintiff's employment were unsupported, inconsistent, or otherwise not credible. Weber cited the investigative report findings and said he placed particular emphasis on the fact that Plaintiff had previously been placed on a PIP due to what Weber considered to be similar concerns – that is, Plaintiff had previously been placed on a PIP for causing an NJCAA violation despite having been specifically told by Heinrich not to allow a particular player to travel or compete. Against that background, Weber cited examples of Plaintiff having continued to feed bus drivers after being told not to, of feeding a recruit's family despite knowledge it was prohibited,

and of not depositing collected funds despite being instructed to do so and giving inconsistent responses about his failure to do so.

As Plaintiff concedes, "[t]he relevant issue is not whether the stated reasons [for termination] were wise, fair, or correct but whether the defendant honestly believed those reasons and acted in good faith."  (Doc. 88 at 34) (citing *Stover v. Martinez*, 382 F.3d 1064, 1076 (10th Cir. 2004)).  Against this background, Plaintiff has cited no evidence from which a reasonable jury could find that Weber's stated rationale was a pretext for unlawful discrimination or retaliation.

Plaintiff argues evidence of pretext arises from the fact that numerous allegations against him were found to be false, from the fact that Weber previously disciplined rather than fired a coach who lied about an act of vandalism,[5] from the failure to discipline the women's soccer coach for allowing recruits' parents to eat with the team, and/or from the fact that "[o]thers in similar situation[s] were not terminated."   (Doc. 88 at 34.)   None of these assertions, alone or in combination, shows that Weber's decision to terminate Plaintiff's employment was pretextual. The fact that many of the allegations against Plaintiff were ultimately found to be false says nothing about the validity of the allegations that were substantiated.  The fact that Weber previously disciplined rather than fired another coach who lied about vandalism of a poster does not reasonably suggest that Weber's stated reason for firing Plaintiff was pretextual.  Plaintiff cites no evidence that the situation of the two coaches was comparable, as Weber's decision to terminate Plaintiff's employment was premised on his assessment that Plaintiff had previously been disciplined for engaging in conduct of a similar nature.  Plaintiff cites evidence that assistant coach Jimmy Perez once saw parents of soccer recruits eating at a breakfast provided by the JCCC

---

[5] Plaintiff asserts that this was the "same non-minority head coach" who allowed an ineligible student to participate in a track-and-field event.  (Doc. 88 at 28.)  Plaintiff fails to support that allegation, however, by citing to evidence that the same coach was involved in both incidents.

women's team in Texas, but Perez's testimony also shows that he never reported this fact to the school and never said anything about it to the women's coach.  (Doc. 88-31 at 5.)  Plaintiff also alludes generically to differential treatment of "other" coaches but fails to support it with specific evidence showing a similar situation that the school treated differently.  Not only was Plaintiff previously disciplined for conduct arguably similar in nature to the conduct that led to his termination, but in each of the instances cited by Weber Plaintiff also had some sort of prior notice or warning that his conduct was problematic.  For example, Plaintiff admits that Stange told him to deposit any funds collected from t-shirt fundraising, but Plaintiff failed to do so and offered several explanations that were seemingly evasive or contradictory.  As the investigative report indicated, this failure combined with Plaintiff's failure to keep records left the school unable to accurately account for such funds.

Plaintiff takes issue with the fairness of using anonymous complaints as a basis for investigation and with the nature of the investigation itself.  The wisdom of fostering anonymous complaints is debatable.  It may allow exposure of wrongdoing that would not otherwise come to light but could also shield accusers from accountability and permit false accusations to be made with impunity.  Indeed, Plaintiff asserts that the complaints against him included many false assertions and came "from sources clearly within the athletic department."[6]  (Doc. 88 at 34.)  But JCCC adopted this system without regard to Plaintiff's particular situation, and no reasonable inference of pretext arises from the fact that Defendants conducted an investigation after receiving the complaints.  Plaintiff cites no evidence of any similar Ethics Point reports alleging improprieties against other coaches that were ignored or treated differently.  As for Plaintiff's

---

[6] Plaintiff points to soccer team member Brad Tully and office assistant Heidi McCormick.  Among other things, Plaintiff cites evidence that McCormick acted as a mentor of sorts to Tully, that McCormick and Plaintiff did not like each other, and that Tully frequently complained to McCormick about the soccer coaches.

allegation that the source of the reports was someone in the athletic department or on the soccer team, even if true that fact does not tend to show that Defendants' reliance on the anonymous reporting system was a pretext for discriminating against Plaintiff.  Part of the purpose of such "whistleblower" systems is that it encourages insiders with intimate knowledge of the operation to come forward.  The fact that JCCC employed such a system does not imply that the resulting investigation or discipline was pretextual.  Plaintiff also asserts that the investigation suffered from various flaws (which he does not articulate, see Doc. 88 at 34).  It is true that an inference of pretext arises if an employer failed to conduct what appeared to be a fair investigation of an alleged violation.  *See Markley v. U.S. Bank Nat'l Assoc.*, 59 F.4th 1072, 1082 (10th Cir. 2023).  But this investigation included a review of relevant records, interviews of numerous persons with knowledge of the issues, ample opportunity for Plaintiff to present his side of the story (including through two interviews and written responses), and procedural protections including a right to take an administrative appeal.  There may indeed have been flaws or shortcomings in the investigation. But that fact alone is insufficient and Plaintiff fails to cite evidence suggesting the investigation itself was pretextual or infected by discriminatory bias. *Cf. Markley,* 59 F.4th at 1083 (rejecting pretext argument because "flaws in an investigation could be attributable to many factors, including a less than diligent investigator or a nondiscriminatory ulterior motivation an employer may have for terminating an employee. Thus, without some other indicia of pretext, a jury would be left to speculate that the investigatory flaws were attributable to a discriminatory motivation.") It would amount to pure speculation here to find discriminatory intent from the mere fact of a less-than-perfect investigative process.  Notably, Plaintiff fails to show how any flaw in the investigation affected the outcome or impacted Weber's termination decision.  *See id.* (for an inference of pretext to arise on the basis of a procedural irregularity, "there must be some evidence

that the irregularity *directly and uniquely disadvantaged [the employee.*]" (quoting *Conroy v. Vilsack*, 707 F.3d 1163, 1176 (10th Cir. 2013) (emphasis added).

Plaintiff genuinely believes termination was not warranted in his case.  But absent evidence of pretext or unlawful discrimination, the court "may not second guess the business judgment of the employer." *Dewitt v. Southwestern Bell Tel. Co.*, 845 F.3d 1299, 1307 (10th Cir. 2017).  "[O]ur role is to prevent intentional discriminatory … practices, not to act as a 'super personnel department,' second guessing employers' honestly held (even if erroneous) business judgments." *Id.* (quoting *Young v. Dillon Cos., Inc.*, 468 F.3d 1243, 1250 (10th Cir. 2006)).

In sum, the court concludes that Plaintiff has failed to cite evidence showing a genuine issue as to whether Defendants' stated explanation for Plaintiff's termination was pretextual. Defendants are accordingly entitled to summary judgment on Plaintiff's Title VII and ADEA claims.

## IV.  Conclusion

Defendants' motion for summary judgment (Doc. 84) is GRANTED.  The clerk is directed to enter judgment of dismissal in favor of Defendants. IT IS SO ORDERED this day 21st of April, 2023.

_____s/ John W. Broomes_____
JOHN W. BROOMES
UNITED STATES DISTRICT JUDGE

27